**David MILLER, Sr., Plaintiff,**

v.

**CP CHEMICALS, INC., Defendant.**

**C/A No. 3:91–2907–17.**

United States District Court,
D. South Carolina,
Columbia Division.

Dec. 30, 1992.

---

**4.** Such action would now be actionable under statute. S.C.Code Ann. § 41–1–80 (Law Co-op Supp.1991).

S. Jahue Moore, Kirkland, Wilson, Moore, Allen, Deneen & Taylor, P.A., West Columbia, S.C., for plaintiff.

Michael S. Thwaites, Ingrid J. Blackwelder, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, S.C., for defendant.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This is an action by David Miller, Sr., a former employee of the defendant, CP Chemicals, Inc. ("CP") arising out of a dispute over the ownership to certain rights in computer programs. In his complaint, Miller alleges that he owns the copyrights to computer programs he developed while he was employed by CP. He further alleges that the defendant has continued to use these programs without authorization and that such use constitutes copyright infringement, breach of an employment contract, wrongful conversion, breach of contract accompanied by fraudulent act, and a violation of the South Carolina Unfair Trade Practices Act. For the reasons set forth below, the court concludes that the plaintiff's claim for copyright infringement should be dismissed both because the plaintiff has failed to register any copyrights on the computer programs in issue and because, even if the programs had been properly registered, they constitute "work for hire" within the meaning of the Federal Copyright Act. 17 U.S.C. §§ 201(b), 411(b). With regard to the state law claims, the plaintiff has withdrawn three of the four claims, and now only asserts a breach of contract claim. As to this claim, the court determines that the state law claim is preempted by the Copyright Act and, additionally, fails on its merits.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). It is well-established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The facts viewed in the light most favorable to the plaintiff are as follows: Miller was initially employed by CP as a technician in the quality control laboratory. His job entailed analyzing finished products to assure their conformance to customer specifications. After about three months, Miller was promoted to the position of senior laboratory chemist. In that capacity, he first began working with a computer in connection with his job by utilizing a Lotus 1–2–3 software package, which he had requested that CP purchase, for the purpose of keying in the company's computer analytical data regarding customer product specifications. In February, 1989 Miller was promoted to laboratory supervisor and, in that capacity, assumed overall responsibility for the operation of the quality control laboratory. At this time, CP began renovating the quality control lab, and Miller organized the laboratory's records to meet EPA and OSHA regulations. Miller also completed the computerization of all analytical data generated in the lab. During this process, Miller became concerned about the efficiency of performing manual calculations in the quality control lab for in-process adjustments to one of CP's commercial products. As a result, Miller wrote a computer program that computed complex mathematical calculations, eliminating manual calculations previously used to make the required adjustments to this product. This computer program simplified his duties with CP and reduced the chance of error in calculation.

At this time, Miller's supervisors, Jerry Poe and Wilson Oldhouser, approached him regarding computerizing the calculations for other product adjustments. Oldhouser then told Miller to continue writing the programs, and Miller did develop more computer programs.

Miller performed most of the work on the computer programs at his home and on his own time. Miller, who was an employee paid by the hour, never requested or received additional or overtime pay for his work on the computer programs.

According to Miller, Poe and Oldhouser orally agreed with him that Miller would retain the copyrights in the computer programs that he developed and that CP could use them only so long as he remained employed with CP.

Miller was terminated from his employment in June, 1991,[1] immediately following his arrest in a drug related charge. Subsequent to his termination, Miller demanded that CP either return the computer programs that he had written or pay him a

---

1. The plaintiff was at all times prior to his termination an at-will employee with no written employment contract.

license fee for continued use of the programs. CP refused these demands.

The only writing concerning any intellectual property rights produced was a writing signed only by Miller, which allegedly granted CP a right to use the programs so long as Miller was employed by CP. Although the written consent to use the programs was signed only by Miller, it was posted on the computer terminal at the office for all users to see. Also, the computer programs contained a line in them which stated that the copyrights were reserved in the name of Miller. However, this copyright notice was in the program code only and was not displayed on the screen when the program was booted onto the computer hardware.

### 1. Copyright Registration

■ Initially, CP contends that plaintiff's infringement claim should be dismissed because he has not registered any copyrights. Pursuant to § 411 of the Federal Copyright Act, "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this Title." 17 U.S.C. § 411(a) (Supp. 1992). In its opening brief, CP referred to a search performed by the United States Copyright Office which indicated that the plaintiff had never registered copyrights for any of the computer programs involved in this case. At his deposition, Miller testified, under oath, that he had filed the copyright application and paid the filing fee.

In his memorandum of law opposing CP's summary judgment motion, Miller's attorney contends that: 1) the computer programs in dispute were, in fact, copyrighted by Miller or, if they were not, that 2) copyright registration is not required in this case because Miller applied for copyright, paid the filing fee, and his application was denied. At oral argument, Miller's attorney expounded upon this argument and contended, in essence, that whichever of these two scenarios occurred, this action is still properly before the court. That is to say, Miller either applied for and received copyright registration, or he applied for and had the copyright registration denied. It was candidly conceded that if application had been made and the copyright denied, Miller would be required to join the copyright office as a defendant in this action, and Miller's attorney indicated a willingness to do this. Faced with an inadequate record on this issue, and Miller's inconsistent positions on what action he has taken, the court deferred ruling on this issue and entered an order on July 21, 1992, directing Miller to obtain certification from the copyright office that he had either registered the copyrights or that he had applied for the copyrights and been denied registration. The court's order was entered after the court's law clerk had telephoned the copyright office and learned that it was possible to request a search of copyright issuances *and denials.* In accordance with the court's directive, Miller's counsel wrote to the copyright office requesting such verification. The court thereafter granted several extensions of time within which to produce the information. Finally, the copyright office responded to Miller's attorney and indicated simply that no copyright registrations had been disclosed in its search. There was no mention of any application for copyright being denied. Subsequent to receipt of this information from Miller's counsel, CP's counsel has produced a third certificate from the copyright office which indicates that no copyright applications are of record in that office. In sum, therefore, the court has before it two documents indicating separate copyright searches and no copyright issuance. Further, defendant has produced certification from the copyright office that no application was made and denied. The court waited nearly six months for information to the contrary from plaintiff. In short, therefore, the court feels that it has allowed more than an ample opportunity for Miller to produce one of the two jurisdictional prerequisites to this action, and he has failed to do so. His deposition testimony that he has secured copyright registration, viewed in light of the three separate copyright searches that have been produced for the court, is insufficient to create a genuine issue of material fact as to this essential

jurisdictional prerequisite. Moreover, Miller's alternative position, that he has applied for copyright registration and been denied, is simply not supported in the record, despite the court's allowing Miller nearly six months to produce documentation to this effect.

Plaintiff's lack of registration is fatal to his copyright infringement cause of action and requires its dismissal. Without the copyright certificates, the plaintiff has no *prima facie* evidence of registration, and thus has no standing to sue for copyright infringement. *See Collins & Aikman Corp. v. Carpostan Industries, Inc.,* 720 F.Supp. 561, 564 (D.S.C.1989).

### 2. Work For Hire

Section 101 of the Copyright Act defines "work for hire" two different ways. Subsection (1) provides that a "work prepared by an employee within the scope of his or her employment" is a work for hire. Subsection (2) deals with works specially ordered or commissioned. Subsection (1) applies in this case, and subsection (2) is not relevant. *See Community For Creative Non-violence v. Reid,* 490 U.S. 730, 750–51, 109 S.Ct. 2166, 2178, 104 L.Ed.2d 811 (1989) (section (1) applies if the employee/employer relationship is a master/servant relationship and subsection (2) applies to independent contractors). In determining whether a person is an independent contractor or an employee, the Court stressed the following:

> the skill required, the source of the instrumentalities and tools, the location of the work; the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment, the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision

of employee benefits, and the tax treatment of the hired party.

490 U.S. at 751–52, 109 S.Ct. at 2178–79. In this case, Miller was a full-time employee of CP. Clearly, the relationship between Miller and CP was that of master and servant as opposed to employer and independent contractor. Thus, subsection (1) of section 101 is the correct definition to apply in this case.

Section 201(b) of the Copyright Act provides that "[i]n the case of a work for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

In *Baltimore Orioles v. Major League Baseball Players Ass'n,* 805 F.2d 663 (7th Cir.1986), the court stated:

> an employer owns a copyright in a work if (1) the work satisfies the generally applicable requirements for copyrightability set forth in 17 U.S.C. § 102(a), (2) the work was prepared by an employee, (3) the work was prepared within the scope of the employee's employment, and (4) the parties have not expressly agreed otherwise in a signed, written instrument.

*Id.* at 667.

In applying the work for hire doctrine, the court is faced with two key issues: (1) whether the computer programs created by Miller were done so within the scope of his employment; and (2) whether there is a sufficient writing rebutting the presumption that the employer retains the copyright in a work for hire.

#### A. Scope of Employment

 Miller contends that the computer programs were a result of his own initiative and that they were written and tested at his home on his personal computer. Miller also asserts that he is an hourly employee and was never paid for the work that he did in developing the computer programs.[2]

---

**2.** The court notes the fact that Miller was an hourly employee and did not receive compensation for the work done by him outside the place

of employment on the computer programs is a factor weighing heavily in his favor with regards to scope of employment.

On the other hand, CP asserts that the computer programs were created during the course of Miller's employment with CP [3] and solely for the purpose of simplifying his duties at CP. CP also asserts that the programs are product specific in that they relate directly with the calculations done for specific products manufactured by CP. CP also claims that Miller, as supervisor, had broad responsibilities for organizing and updating the quality control lab, and that writing the computer programs, although not required, was in connection with and incidental to his job. Finally, CP argues that Miller's position that the computer programs were not created within the scope of his employment is inconsistent with his other claim that those same programs were developed pursuant to an alleged employment contract.

In *Commission For Creative Non-violence v. Reid,* 490 U.S. 730, 741, 109 S.Ct. 2166, 2173, 104 L.Ed.2d 811 (1989), the Court held that "the term 'employee' should be understood in light of the general common law of agency." Thus, this court finds that the general common law of agency would also be relevant to the analysis of the term "within the scope of employment."

The RESTATEMENT (SECOND) OF AGENCY § 228 (1958) [4] provides:

(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.[5]

The comments to section 229 state that acts incidental to authorized acts may be within the scope of the employment:

*Acts incidental to authorized acts.* An act may be incidental to an authorized act, although considered separately it is an entirely different kind of an act. To be incidental, however, it must be one which is subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do. The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive.

RESTATEMENT (SECOND) OF AGENCY § 229 comment b (1958).

In this case, Miller was not hired primarily for the development of computer programs. However, as supervisor of the quality control laboratory, he was responsible for the organization and updating of the laboratory. Thus, the development of the computer programs was at least incidental to his job responsibilities because it was "within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do."

With regard to the second element, Miller worked primarily, if not entirely, on the computer programs at his home on his own time and for no additional pay. On the other hand, the work was performed during the time period in which he was employed by CP.

With regard to the third element, there is no question but that the development of the computer programs was actuated, at least in part, by a purpose to serve the master. The initial program was created to simplify Miller's job and to eliminate errors, which was for the benefit of both Miller and CP. Officials at CP expressly asked Miller to continue to develop computer programs that dealt with other products of CP. Finally, each computer program dealt specifically with a product manufactured by CP. The ultimate purpose of the

---

3. In the complaint, Miller concedes that "[d]uring the course of Plaintiff's employment, he was requested to computerize the quality control laboratory and to focus as much as possible on complex calculations." Complaint at 1.

4. The Restatement provisions relate directly to the question of respondeat superior liability of the employer for the tortious acts of the servant.

Thus, the Restatement's discussion of the scope of employment is not directly on point with the issues in this case. However, the Restatement's discussion is generally applicable.

5. The fourth element deals with intentional torts committed by the employee and thus is not relevant to this case.

development of the computer programs was to benefit CP by maximizing the efficiency of the operation of the quality control lab.

In *Marshall v. Miles Laboratories, Inc.*, 647 F.Supp. 1326 (N.D.Ind.1986), an employee wrote an article entitled *The Potential of Immobilized Biocatalysts for Production of Industrial Chemicals.* In determining copyright ownership, the primary issue in that case was whether the article had been written by the employee within the scope of his employment. The employee argued that the article was written by him at his home, that the employer never specifically instructed him to write the article, and that he was never given additional compensation for the article. The employer argued that (1) the research which provided the basis of the article was done at the employer's office by the employer's scientists; (2) the employee discussed the article with one of the employer's scientists at the employer's office; (3) the scientist was the co-author of the article; and (4) the employer reimbursed the employee for expenses incurred in relation to his presentation of the article at a symposium. In that case, the employee's job description included as one of his responsibilities to "develop, summarize and report information about advances in technologies of interest to IPG ..." *Id.* at 1330. In *Marshall*, the court found that although the article was not written while the employee was at work or at the direct request of the employer, the creation of the work was within the scope of his employment.

The factual situation in *Marshall* is much more readily identifiable with the common notions of scope of employment than in the present case. Miller's job description did not specifically state that he was to develop computer programs. Miller was not assisted by others in the development of the computer programs.[6] Finally,

Miller did not receive any type of additional compensation for the work done on his own time. However, the driving force behind the creation of the computer programs was to benefit CP by making the quality control laboratory more efficient. Furthermore, the development of the computer programs was clearly incidental to the other work performed by Miller.

After considering the factual circumstances in this case in light of the Restatement factors and the case law concerning the issue, the court concludes that the development of the computer programs by Miller was within the scope of his employment.[7]

## B. Sufficient Writing To Rebut Statutory Presumption

■ Section 201 places the burden on the employee to show the existence of a writing granting the employee the copyright in any work for hire. In this case, the only writing is a writing signed only by Miller. Section 201 specifically requires that the employer sign the writing to be effective. Courts have also found that unwritten understandings or writings not containing the signatures of both parties are insufficient to rebut the statutory presumption. *Arthur Retlaw & Assoc. v. Travenol Lab., Inc.*, 582 F.Supp. 1010 (N.D.Ill.1984); *see also Baltimore Orioles v. Major League Baseball Players Ass'n*, 805 F.2d 663, 671–73 (7th Cir.1986).

In *Travenol*, the court discussed an extremely similar situation. In that case the evidence of a transfer of the copyright to the employee from the employer consisted of: (1) an alleged oral "understanding;" (2) a letter to the employer signed by the plaintiff; and (3) the plaintiff's unilateral act of placing its name in the copyright notice. The court found that such evidence did not constitute a sufficient writing, un-

---

6. The data used in running the computer programs did come from research done by other employees at CP.

7. The court notes that normally work done by an hourly employee outside of the workplace and for which he is not compensated would not be within the scope of employment. But, as in

this case when the driving force behind the creation of the work is directly related to a specific product of the employer and the employee's job responsibilities, and for the primary benefit of the employer, such work may be within the scope of employment.

der section 201, to rebut the employer's presumed right to the copyright in a work for hire. Moreover, the court strictly applied the statute's language which requires a writing signed by the employer.

In this case, Miller argues that the writing signed only by himself, in combination with the fact that it was posted on the computer terminals, gives rise to a material issue of fact whether or not an agreement existed. Miller cites only *Computer Data Systems, Inc. v. Kleinberg,* 759 F.Supp. 10 (D.D.C.1990), for this proposition. In *Kleinberg,* however, the parties had an agreement signed by both parties, but the language of the agreement created a question of fact whether the conditions of the agreement had been met. In the present case, there is no signed writing signed by both parties. Thus, *Kleinberg* is clearly distinguishable.

Although section 201 may sometimes create harsh results, it clearly places the burden on the employee to obtain a written agreement, and not merely an oral understanding, that the employee will retain the copyright interests in the works he creates while within the scope of his employment. Miller has not met that burden in this case, and the programs must therefore be considered "work for hire."

### 3. State Law Claims

In Miller's complaint he originally alleged four state-law claims: (1) breach of employment contract; (2) conversion; (3) breach of contract accompanied by a fraudulent act; and (4) violation of the South Carolina Unfair Trade Practices Act. At the hearing held on July 16, 1992, counsel for Miller voluntarily withdrew the second, third, and fourth state-law claim. Thus, the only remaining state-law claim is for the breach of an employment contract.

CP argues that the breach of employment cause of action is preempted by the

Copyright Act and otherwise fails as a matter of law.

### A. Preemption

■ Section 301 of the Copyright Act provides:

[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright, as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by Sections 102 and 103 ... are governed exclusively by this Title.... [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state.

17 U.S.C. § 301(a).[8]

Section 106 of the Copyright Act protects the following rights:

(1) reproduction of the work;[9]

(2) preparation of derivative works;

(3) distribution of copies by sale or otherwise;

(4) in certain works, the public performance of the work;

(5) in certain works, the public display of the work.

In *Patsy Aiken Designs, Inc. v. Baby Togs, Inc.,* 701 F.Supp. 108, 110 (E.D.N.C. 1988) (citing *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1535 (S.D.N.Y.1985)), the court stated the general rule that "in order to escape preemption under 17 U.S.C. § 301, a state law claim of unfair competition must include some qualitatively different 'extra element' besides copying." In *Patsy,* the court held that the plaintiff's claims under unfair competition (misappropriation) and fraud theories were preempted because the only wrong committed was the reproduction of copies. The court went on to say that "[f]ederal courts have repeatedly held that state law claims

---

**8.** At the hearing, the court raised the issue of whether there was an issue in the case concerning the copyrightability of the underlying computer programs, which could impact upon the application of the Copyright Act and thus the preemption clause. Both parties agreed that

there was no issue concerning the copyrightability of the computer programs.

**9.** The act of inputting computer software onto a computer constitutes the making or reproducing of a copy of the program, which is one of the exclusive rights of the copyright holder.

for 'misappropriation' or 'unfair trade practices,' are preempted by the Copyright Act of 1976." *Id.* at 111 (citations omitted).

Neither party has cited case law specifically discussing the preemption of an employment contract claim. However, Miller was an at-will employee, and there exists no writing which otherwise establishes an employment contract. Miller alleges that the oral promise by the employer that he would retain the copyrights to the computer programs creates a separate and independent cause of action. The Copyright Act expressly addresses the situation concerning the ownership of copyrights between the employer and the employee in works for hire. The Copyright Act affords a presumption to the employer, under the work for hire doctrine, that the employer shall receive the copyright, and that such presumption will not be rebutted except by a writing signed by the employer. If the employee can bring a lawsuit under state law based upon an alleged oral promise, then the presumptions created under the Copyright Act would be substantially, if not, totally undermined. The court finds that the plaintiff's breach of employment contract is an artful restructuring of the copyright claim and is, therefore, preempted.

**B. Merits of the State Law Claim**

■ Both parties cite *Small v. Springs Industries, Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987) as authority for their positions. In *Small,* the court found that an employee handbook, along with oral assurances, constituted an employee contract. This case is factually distinguishable. There is no signed writing establishing the conditions of the employee contract.

Even if the court found that the writing signed by Miller was binding upon CP, by acquiescence or otherwise, it does not form an employment contract. It does not state that Miller will not be terminated. It does not spell out specific procedures for termination guaranteed to Miller. It only states that CP has the right to use the programs so long as Miller is employed. If we assume that the writing is enforceable and

that Miller retained the copyright in the programs, Miller would not have a claim for breach of an employment contract, he would have a copyright claim for unlawful use of the copyrighted work.

For the above reasons the court finds that the breach of an employment contract is without merit.

For all of the reasons set out above, the defendant's motion for summary judgment is granted.

IT IS SO ORDERED.